**Arthur CHAMBLESS and Mildred H. Chambless, Plaintiffs,**

**v.**

**MASTERS, MATES & PILOTS PENSION PLAN, et al., Defendants.**

**No. 80 Civ. 4258 (RLC).**

United States District Court,
S.D. New York.

Sept. 14, 1983.

---

Wisehart & Koch, New York City, for plaintiffs; Arthur M. Wisehart, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for M.M. & P. Pension Plan, Maher, M.M. & P. Pension Plan Trustees and Maritime Service Committee; Bettina B. Plevan, Eileen Reinhardt, New York City, of counsel.

Burton M. Epstein, New York City, for Intern. Organization of Masters, Mates and Pilots.

Seham, Klein & Zelman, New York City, for American Maritime Ass'n and Wabash Transport, Inc.

Lambos, Flynn, Nyland & Giardino, New York City, for Central Gulf Lines, Inc.; Richard P. Lerner and Peter C. Lambos, New York City, of counsel.

Hill, Betts & Nash, New York City, for Amerada Hess Corp.

Townley & Updike, New York City, for Amoco Shipping Co.

White & Case, New York City, for Waterman Steamship Corp.; Rayner M. Hamilton and Margery A. Colloff, New York City, of counsel.

## OPINION

### I

ROBERT L. CARTER, District Judge.

In this action, Arthur M. Chambless ("plaintiff"), a veteran seaman, and his wife, Mildred H. Chambless, allege, *inter alia*, that his pension benefits have been improperly forfeited, that the trustees of his pension plan violated their fiduciary duties, and that his former union and former employers violated the antitrust laws by conspiring to deter him from working on vessels owned by competing shipping companies and represented by a rival union. Chambless and his wife seek restitution of the allegedly forfeited pension benefits, treble antitrust damages, and a clarification of their pension rights.

Chambless, a licensed deck officer, began sailing as a member of the International Organization of Masters, Mates & Pilots ("MM & P") on October 27, 1944. Chambless Aff. ¶ 2; Maher Aff. ¶ 4. Often serving as chief mate, Chambless continued working on vessels represented by the MM & P until December, 1976, when he submitted his first application to the MM & P Pension Plan ("the pension plan" or "the plan"). Complaint ¶ 2; Chambless Aff. ¶¶ 16–17; Maher Aff. ¶ 5.

The plan is a multi-employer pension plan that was established by an Agreement and Declaration of Trust dated August 1, 1955, in order to provide pension benefits to licensed deck officers working for companies that have collective bargaining agreements with the MM & P. Maher Aff. ¶¶ 2–3. The plan is funded solely by employer contributions and is administered by an equal num-

ber of employer and union designated trustees. *Id.* ¶ 2.

Chambless withdrew this pension application, however, because his "love for the sea" continued to beckon. Complaint ¶ 18; Exh. 4 to Maher Aff. He maintains that he submitted his initial pension application only after what he terms illicit union pressures compelled him to consider retiring. Complaint ¶ 17.

First, Chambless alleges that the MM & P maintains a policy of strongly encouraging—Chambless would say strong-arming—its older, more experienced members to retire so that the union can replace them with "new young blood" and thereby obtain more union dues. *Id.* ¶ 15; Chambless Aff. ¶¶ 6–7. He maintains that the union wrongfully assigned senior positions to officers more junior than he, failed to pursue his grievances on these matters, and, beginning in 1976, offered him less prestigious, lower paying work as a first, second, or even third mate. Chambless Aff. ¶¶ 4–6, 10–11. Chambless asserts that being assigned to work as a third mate was of "great humiliation for a licensed deck officer of my years of experience" and says that such assignments caused him to consider retiring. *Id.* ¶ 11.

Second, Chambless maintains that the union sought to usher him into retirement because he "knew too much" about, *inter alia*, favoritism and discrimination in work assignments and grievance processing, self-dealing by union officials with local funds, improper recordkeeping, and efforts to harass and intimidate certain employees into retiring. Complaint ¶ 14. Both the union and the plan deny Chambless' allegations about favoritism, discrimination, intimidation, and pressures placed on older members. Answer of MM & P ¶¶ 14–16; Answer of Pension Plan ¶¶ 15–16.

In early 1977, disgruntled with the low-level, low-paying assignments that the MM & P hiring hall had given him, Chambless took a two-week assignment as master on an oil-drilling rig that did not have a contract with the MM & P. Chambless Aff. ¶ 12. He said that he did this only after he

had asked a union agent at the hiring hall whether it would be all right for him to take such a job and only after the union agent told him that the union would have no objection. *Id.;* Complaint ¶ 21. When Chambless returned to shore after his fortnight on the rig, he was informed that because he had worked on a non-MM & P rig, he was no longer in good standing with the union. This was so, Chambless maintains, even though many other union members who worked on non-MM & P vessels were not so tarred. Chambless Aff. ¶ 13.

Disgruntled, Chambless then, to use his words, "retired from employment under the MM&P contract and filed [his second] application for pension benefits." *Id.* ¶ 14. At about the same time, Chambless accepted employment as a master on the Mount Explorer, an ocean-going vessel that was operated by a company that had a collective bargaining agreement with a rival union, the Marine Engineers Beneficial Association ("MEBA"). *Id.* ¶ 15. The two unions representing licensed deck officers—MM & P and MEBA—have been in intense competition for at least two decades, *see MM & P v. NLRB (Westchester Marine Shipping Co.),* 539 F.2d 554, 556–57 (5th Cir.1976), *cert. denied,* 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 87 (1977), and the Mount Explorer on which Chambless sailed has been the focus of a picketing dispute and unfair labor practice lawsuit between the two labor organizations. *See MM & P v. NLRB (Cove Tankers Corp.),* 575 F.2d 896 (D.C.Cir.1978).

Chambless submitted his second pension application on or about April 2, 1977. Chambless Aff. ¶ 14; Maher Aff. ¶ 6; Exh. 5 to Maher Aff. Six days later, Stephen P. Maher, the administrator of the plan, wrote Chambless, as he had done after Chambless had submitted his first application, to acknowledge receipt of Chambless' application and to advise him of the plan's definition of retirement.[1] Maher Aff. ¶¶ 5–6; Exh. 6 to Maher Aff. On June 30, 1977, a plan employee wrote Chambless to inform him that the trustees would consider his application, and that his monthly benefits would be approximately $920 on a percentage basis and $570 on a flat basis.[2] Exh. 8 to Complaint.

On July 19, 1977, Maher wrote Chambless to inquire whether Chambless had, as was rumored, taken a job on a non-MM & P vessel. Exh. 9 to Maher Aff. In November, 1977, the plan received a letter from Chambless acknowledging that he had taken such employment beginning April 4, 1977. Exh. 8 to Maher Aff.

At their November 30, 1977 meeting, the pension trustees considered Chambless' application, Maher Aff. ¶ 13, and on January 26, 1978, Maher wrote to Chambless to inform him that the plan's trustees had concluded that because he had not retired under the plan's definition of retirement, he was not eligible for a pension at the time. Exh. C to Complaint. Furthermore, Maher informed Chambless that the plan would not pay him any pension until he reached the age of 65, which the plan defines as "normal retirement age."[3] *Id.;* Article I,

---

1. Article II–A, Section 15(a) of the 1977 plan regulations states:

 *Retirement Defined*

 To be considered retired, a person must withdraw completely from any further employment, in any capacity, aboard any vessel whatsoever. As used in the foregoing sentence, the word "vessel" shall not include fishing vessels, yachts, dredges, oceanographic, or research vessels of 300 feet or less in length. Upon application by the pensioner, the Trustees may, in their sole discretion, authorize employment aboard other small craft, which the Trustees, in their sole discretion, consider similar type vessels. (Amendment No. 49—Adopted March 2, 1977).

2. It appears that the plan employee who wrote the June 30, 1977 letter was mistaken in stating that Chambless would be entitled to $570 per month on a flat rate basis. Both a letter written by plan administrator Maher and Article II–A, Section 3 of the regulations state that the pension on a flat basis for a participant with 30 years of pension credit is $470.

3. Article I, Section 13 of the plan regulations states: " 'Normal Retirement Age' shall mean the age of 65, or, if later, the age of the Participant on the tenth anniversary of his participation." It was passed on December 29, 1975 as part of Amendment 42.

Section 13 of the plan regulations. Chambless will not turn 65 until December 7, 1986. Complaint ¶ 10. In a January 28, 1980 letter, Maher advised Chambless that the monthly pension benefits he is to receive upon turning 65 will likely be $470. Exh. C to Complaint.

In deciding that Chambless would not receive pension benefits until he turns 65, the trustees acted pursuant to Article II–A, Section 15(a)[4] and Amendments 46 and 47 to the plan regulations. The amendments were passed on August 26, 1976, and were encoded in Article II–A, Section 15(b) and Article II–A, Section 20.[5] Article II–A, Section 15(b) states in pertinent part:

If a Pensioner works in covered employment forbidden by this Section,

1. He shall not be entitled to pension benefits for any month of such employment and for six additional months, provided that the additional six month period shall not extend beyond his Normal Retirement Age, as defined in Article I, Section 13; provided further, however, that if such employment is in the capacity of a Licensed Deck Officer on a U.S. flag ocean-going vessel employed by a company which is not a participant in the M.M. & P. Pension Plan or the MM & P/PMA Pension Plan ..., then the Pensioner shall not be entitled to pension benefits for any month of such employment nor for any months prior to such Pensioner reaching his Normal Retirement Age, as defined in Article I, Section 13.[6]

Echoing the above quoted provision, Article II–A Section 20 states in pertinent part:

In the event a Participant subsequent to his accrual of credit for 10 years of vesting service and prior to his retirement, is employed in the capacity of a Licensed Deck Officer on a U.S. flag ocean-going vessel employed by a company which is not a Participant in the M.M. & P. Pension Plan or the MM & P/PMA Pension Plan ..., such Participant shall not be entitled to any pension benefits prior to his reaching his Normal Retirement Age, as defined in Article I, Section 13.

Chambless appealed the trustees' rejection of his application and appeared with counsel at the December 5, 1979 trustees' meeting. Maher. Aff. ¶ 10. On March 5, 1980, the trustees again voted to deny Chambless' pension benefits until he turns 65. *Id.*

On June 24, 1980, Chambless brought this suit against the pension plan, Stephen Maher, the plan administrator, the MM & P, the plan's employer and union trustees,[7] the Maritime Services Committee and the American Maritime Association, employer organizations that do collective bargaining for shipping companies, and six shipping companies that formerly employed Chambless, have contracts with the MM & P and contribute to the MM & P plan: Amerada Hess Corporation, Amoco Shipping Company, Central Gulf Lines, Inc., National Transport Corporation, Wabash Transport, Inc., and Waterman Steamship Corporation.

Chambless has alleged several wide-ranging claims against these defendants, although it is often unclear which claims are directed against which defendants. The legal theories behind his claims are often

---

4. The text of Article II–A, Section 15(a) is quoted in note 1, *supra.*

5. These citations are to the 1977 MM & P Plan Regulations, Exh. O to Opsahl Aff., which were the regulations in effect when the events relevant to this action occurred. Many of the provisions and amendments relevant to this action have been renumbered and reamended as part of the 1980 MM & P Plan Regulations. Exh. 13 to Maher Aff.

6. The text of Article I, Section 13 is quoted in note 3, *supra.*

7. These trustees and alternate trustees are listed as defendants in this action: C.J. Bracco, Richard M. Casselberry, Michael DiPrisco, E. Gras, George Groh, Justin A. Gross, James Hammer, James J. Hayes, Martin F. Hickey, Charles Jess, F.E. Kyser, Charles Landry, Orion A. Larson, R.L. Lowen, Lloyd Martin, Eric May, David Merritt, Thomas E. Murphy, H.L. Nereaux, William V. Ott, M. Pecil, Franklin J. Riley, Jr., William I. Ristine, A.C. Scott, John Smith, R.J. Soriano, Ernest K. Swanson, Michael Swayne, Allen Taylor, Nicholas Telesmanic, Kenneth P. Wenthen, and C.E. Whitcomb. Complaint ¶ 6.

obfuscated and occasionally overlapping, but the basic claim, and it appears in several different guises, is that the union and plan discriminated against him and caused his pension benefits to be suspended and forfeited because he went to work on a vessel operated by a competing company and represented by a rival union.

In his first cause of action, Chambless asserts that the defendants violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA" or "the Act"), by suspending payment of his vested pension after he went to work on a non-MM & P vessel.[8] Complaint ¶ 28. In a related, if somewhat overlapping claim, he asserts that even if a plan has the right to suspend pension payments when a retiree returns to work, it does not have the right to continue suspending those benefits after the plan participant goes back into retirement. In addition, Chambless says that the plan regulations are causing a forfeiture of his benefits by reducing them from an estimated $920 a month beginning at age 55 to an estimated $470 a month beginning at age 65. Chambless Aff. ¶ 25. The plan contends, however, that its regulations do not provide for any illegal forfeiture and that its trustees acted within the letter of the law in suspending Chambless' benefits until he turns age 65. Maher Aff. ¶ 11.

Chambless also contends that Amendments 46 and 47, by discriminating against plan participants who work on non-MM & P vessels, are "punitive in purpose and effect" and "arbitrary and capricious" and therefore violate the trustees' fiduciary duties. Complaint ¶¶ 28, 29, 33. He also argues that the age that the plan selected for normal retirement age is a "sham" that was chosen to make it easier for the plan and union to discriminate against disfavored members. Id. ¶ 28(a). Chambless accuses the defendants of further violating their fiduciary duties by passing regulations that

allegedly are not for the sole benefit of plan participants and their beneficiaries, by failing to provide a full and fair review of his pension application, and by failing to provide him with certain information that he had requested. In a related claim, Chambless' fifth cause of action charges—evidently alluding to language in the plan documents which states that the trustees must act solely in the interest of the plan participants—that the defendants breached his contractual rights in violation of 29 U.S.C. § 185.[9] Id. ¶ 42.

In addition, Chambless maintains that at no time before he took employment on a non-MM & P vessel did the plan or union notify him of the import of newly enacted Amendments 46 and 47 for participants who take non-MM & P employment. Complaint ¶ 29; Chambless Aff. ¶¶ 29–31; Exh. 10 to Maher Aff.

The plan responds that all MM & P members were notified of the new rules through *The Master, Mate & Pilot,* the union newspaper, and that Chambless was specifically notified by letter. Maher Aff. ¶ 7; Exh. 8 to Maher Aff.

In his second cause of action, Chambless charges that defendants combined and conspired in restraint of trade by "interfer[ing] with the right of licensed deck officers to engage in their trade or profession."[10] Id. ¶ 35. He sees Amendments 46 and 47 as the chief instruments of these efforts. The plan and union deny that the purpose of the disputed amendments was to restrain trade. Answer of MM & P ¶ 32; Answer of Pension Plan ¶ 32. Defendants say that the plan's regulations have always required that benefits be suspended when plan participants work in "prohibited" employment and argue that Amendments 46 and 47 aim to "preserve and enhance the corpus of the MM & P plan." Lowen Aff. ¶ 7.

---

**8.** The court has jurisdiction of this ERISA cause of action under section 502(f) of ERISA, 29 U.S.C. § 1132(f).

**9.** The court has jurisdiction of the fifth cause of action under section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a).

**10.** The court has jurisdiction of this antitrust cause of action under 15 U.S.C. § 15.

Chambless' third cause of action alleges that defendants, because of the assurances they allegedly gave him about accepting employment on non-MM & P vessels "are estopped from denying" him benefits.[11] *Id.* ¶ 38. In his fourth cause of action, Chambless asserts that the MM & P has breached its duty of fair representation by discriminating against senior seamen like himself and by failing to pursue several of his grievances.[12] *Id.* ¶ 40. Defendants deny both the estoppel claim, Answer of Pension Plan ¶ 38, and the duty of fair representation claim. Answer of MM & P ¶ 40.

Plaintiff prays for the payment of his pension benefits retroactive to May 1, 1977, damages of $100 per day for the defendants' failure to furnish him with certain pension information, treble antitrust damages for alleged lost earnings and pension benefits, and a declaration that the defendants' acts are unlawful and null and void under the antitrust laws. Chambless also seeks punitive damages, costs, and attorneys' fees.

## II

The pension plan, the plan trustees and Maher, the plan administrator, and MM & P move for summary judgment on the grounds that 1) the actions taken by the plan trustees are in accordance with the plan regulations and such regulations comply with ERISA and are not arbitrary or capricious or effectuated in bad faith; 2) plaintiff's claims for a declaration of the amount of benefits Chambless will receive at age 65 and a declaration of his wife's rights are not ripe for adjudication; 3) the plan cannot be estopped from acting on the basis of statements allegedly made by employees of the union; 4) the plan's regulations are exempt from antitrust scrutiny by virtue of the non-statutory labor exemption; 5) Chambless has not alleged that he has suffered any antitrust injury, and 6) Chambless received or had access to all the

documents that ERISA requires the plan to supply.

The shipping companies and employers' associations have also moved for summary judgment, asserting that they are not fiduciaries of the plan and cannot be held liable as such and that ERISA requires the plan administrator, not them, to supply certain information. As for the antitrust claims, they argue that they are protected by the non-statutory labor exemption and that plaintiff has suffered no antitrust injury.

Chambless has cross-moved to strike the affidavits of Maher, the plan administrator, and of Robert J. Lowen, the International President of the MM & P. Chambless asserts that the affidavits should be stricken because they contain assertions and legal conclusions about which the affiants allegedly have no personal knowledge.

## III

### LEGAL DETERMINATION

#### A

■ *Ripeness of ERISA Claims*—Defendants contend that Chambless' ERISA claims should be dismissed for lack of ripeness because Chambless has not alleged that he plans to retire in the immediate future and because he is merely seeking a declaratory judgment regarding what amount he will receive at age 65. Defendants maintain that even if the court were to conclude that there is a dispute over an issue of material fact regarding whether the plan has the right to continue suspending Chambless' benefits should he retire before age 65, that issue would not be ripe on the ground that there is no likelihood that Chambless will soon retire.

Similarly, defendants argue that Mrs. Chambless' claim is not ripe because she is seeking merely a declaration of her rights to survivor benefits should her husband die before age 65—an eventuality that they

11. Since this cause of action is in effect an ERISA claim, jurisdiction arises under 29 U.S.C. § 1132(f).

12. The court has jurisdiction of this cause of action under section 301(a) of the LMRA, 29 U.S.C. § 185(a).

assert is hypothetical and remote. In short, they contend that neither Chambless nor his wife suffers any present harm from the plan's regulations. Lastly, they argue that certain events may occur before Chambless turns 65—changes in federal statutes or regulations or changes in the plan regulations or the trustees' interpretation of those regulations—and that these events may significantly alter the inquiry or render it moot.

Chambless responds that this suit does not seek a declaratory judgment, but instead seeks an order overturning certain plan regulations and awarding him benefits at once. He contends that the plan trustees acted arbitrarily and capriciously in suspending his benefits, that the classifications in the regulations are illegal, and that the "normal retirement age" that the trustees selected, i.e., age 65, is a "sham."

In their ripeness arguments, both sides have distorted what Chambless' often unclear complaint says. What is clear, however, is that Chambless and his wife seek a declaration or clarification of their rights, assert that they suffer present harm due to the suspension of Chambless' retirement benefits, and seek damages under ERISA for the defendants' alleged past wrongs.

The jurisdictional section of ERISA states:

A civil action may be brought—

(1) by a participant or beneficiary—
. . . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or *to clarify his rights to future benefits under the terms of the plan;*

. . . .

(3) by a participant, beneficiary, or fiduciary (A) *to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or* (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this

subchapter or the terms of the plan
. . . .

29 U.S.C. § 1132(a) (emphasis added).

Here, the Chamblesses seek not only a clarification of their rights to future benefits but also to "enjoin" a "practice" that allegedly "violates" ERISA. 29 U.S.C. § 1132(a)(3).

The Seventh Circuit addressed many of the ripeness questions raised here in an ERISA case brought by a class of pension plan participants, none of whom had reached the age of 65 or had yet applied for a pension, for a declaration or clarification of their rights after the plan had raised the normal retirement age from 57 to 65. In words that might have been written for the case at bar, the Seventh Circuit stated:

We reject the trustees' contention that this is a "battle of hypotheticals, a classic example of the difficulty of deciding a case concerning a complex technical subject without the benefit of specific facts." . . . [Plaintiff] seeks a determination of the nature and scope of the Plan participants' rights to future benefits. Section 1132 provides that a civil action may be brought "by a participant to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132. *This action is precisely the type of action contemplated by the statute.*

*Janowski v. International Brotherhood of Teamsters,* 673 F.2d 931, 935 (7th Cir.1982) (emphasis added), *vacated on other grounds and remanded for reconsideration of attorneys' fees,* —— U.S. ——, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983).

Chambless' suit to find out whether the plan has the right to suspend his benefits when he took non-MM & P employment and whether he has a right to obtain benefits before age 65 should he retire before that age "is precisely the type of action contemplated by the statute." *Id.* The same is true regarding Mrs. Chambless' effort to obtain a clarification of what her rights are should her husband die before the age of 65.

In arguing that the claims of Chambless and his wife are not ripe, defendants rely on two pre-ERISA cases. In *Lugo v. Em-*

*ployees Retirement Fund,* 529 F.2d 251 (2d Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976), plaintiff challenged a pension plan rule that denied benefits to participants who did not work a total of 90 months during the ten years before they applied for a pension. Lugo was 53 at the time he brought suit, and under the pension plan rules could not receive benefits until he turned 60. The court concluded that Lugo's lawsuit was not ripe since Lugo had to wait seven years before becoming eligible for a pension, because it was very possible that he would accumulate 90 months of work in his last ten years, and because he did not allege "present objective harm" or the "threat of specific future harm" as a result of the challenged rule. *Id.* at 258, *quoting Lecci v. Cahn,* 493 F.2d 826, 829 (2d Cir.1974). The court wrote, however, that had Lugo attacked the validity of the rule requiring that participants be at least age 60 to obtain benefits and had he asserted that he was thus presently entitled to a pension, he would have stated a ripe claim. *Id.* at 257–58.

The instant case is distinguishable from *Lugo* on several grounds. First, whereas Lugo did not attack the age 60 rule and assert that he deserved a pension *at the present time, id.,* Chambless attacks the age 65 normal retirement age of the MM & P plan as illegal, a sham, and an improper bar to his receiving benefits *at the present time.* Second, the *Lugo* court deemed it wise to hold off adjudicating on the merits because ERISA was soon to take effect and "the impact of ERISA prior to the time Lugo reaches age 60 will undoubtedly be considerable." *Id.* at 259. That reason for not addressing the merits is absent here. Third, while Lugo brought his case under § 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), Chambless has brought his case under ERISA, which in its language allowing plan participants and beneficiaries to sue for a clarification of their rights has liberalized ripeness requirements. *See Janowski, supra,* 673 F.2d at 935.

Defendants also rely on *Stewart v. M.M. & P. Pension Plan,* 608 F.2d 776 (9th Cir. 1979), which, like Lugo, was brought under the LMRA, rather than ERISA. Stewart challenged a plan regulation that did not give additional years of pension credit to plan participants who, after having accumulated 20 years of pension credit and after having retired, went back to work. His lawsuit was a declaratory judgment action. *Id.* at 782. Stating that the plaintiff was not "in fact subjected to or imminently threatened with substantial injury," *id,* at 783, and that the plaintiff "did not aver that he wanted to retire or would retire," *id.* at 784, the court held that Stewart's action was not ripe.

The instant case is distinguishable from *Stewart* in several ways. *Stewart* was not brought under ERISA and therefore ERISA's more generous ripeness criteria regarding the clarification of rights were not in effect. Second, while the plaintiff in *Stewart* did not aver that he was suffering present harm, Chambless has alleged that because his pension has been suspended he is suffering present harm from the rules that he is challenging.

For the above reasons, the ERISA claims brought by Chambless and his wife are ripe for adjudication.

B

■ *The Validity of Amendments 46 and 47 under Section 203 and the Federal Regulations*—Amendments 46 and 47 provide that a plan participant who leaves retirement and goes to work on *an MM & P vessel* is to have his pension benefits suspended for the time he is working plus six additional months after he ends his re-employment. These amendments also provide that participants who leave retirement to work *on non-MM & P boats* are to have their pension benefits suspended until they reach normal retirement age—which is 65 under the plan—even if they re-retire well before age 65. (Indeed, under these amendments, any participant with more than ten years' experience who goes to work on a non-MM & P boat is not to receive any benefits until he turns 65.) ERISA requires that participants receive their pension bene-

fits once they reach normal retirement age, so long as they do not continue working in the same industry, trade, and geographical area. 29 U.S.C. § 1053(a)(3)(B)(ii).[13]

Although the gravamen of Chambless' claims here is not pellucid, he appears to claim that the plan's refusal to pay him benefits until he reaches age 65, pursuant to Amendments 46 and 47, is a suspension proscribed by section 203(a) of ERISA, 29 U.S.C. § 1053(a), and by the regulations that the Department of Labor ("DOL") has issued under ERISA. Chambless argues that under section 203(a) and 29 C.F.R. § 2530.203–3(b)(2) (1982),[14] a plan may suspend a retiree's benefits only during the period he is re-employed and then only if the re-employment is in the same industry, trade and geographical area. Chambless maintains that the plan's suspension of his benefits is illegal, first, on the ground that he is not working in the same geographical area and, second, on the ground that should he re-retire before turning 65, the suspension would continue beyond the period of his re-employment.

The plan counters, however, that section 203(a) of ERISA, 29 U.S.C. § 1053(a), "does not restrict in any way" the suspension of a plan participant's benefits before he reaches normal retirement age and that because Chambless has not reached that age, the plan trustees are free to suspend his benefits.

Inasmuch as Chambless misconstrues both section 203(a), 29 U.S.C. § 1053(a), and the DOL regulations, his attack on Amendments 46 and 47 will find no support in either of these sources.

Section 203(a) reads in pertinent part: "Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable *upon the attainment of normal retirement age* . . . ." (emphasis added). This court has stated previously that "[t]he Act, on its face, requires only that pension benefits be nonforfeitable upon attainment of normal retirement age, in this case, age sixty-five. The Act, therefore, gives plaintiff no vested right to receive benefits until he reaches that age." *Riley v. MEBA Pension Trust,* 452 F.Supp. 117, 120 (S.D.N.Y.) (MacMahon, J.), *aff'd,* 586 F.2d 968 (2d Cir.1978). Because Chambless has not reached age 65, the benefits that the plan is suspending are not normal retirement benefits, but are instead *early* retirement benefits. The Second Circuit has noted, moreover, albeit in dictum, that "Congress did not intend for early retirement supplements to be unforfeitable." *Riley v. MEBA Pension Trust, supra,* 586 F.2d at 970 n. 2, *quoting Capocci v. General Motors Corp.,* 444 F.Supp. 1306 (D.Hawaii 1978); *see also Hurn v. Retirement Fund Trust,* 648 F.2d 1252, 1253–54 (9th Cir.1981) (*"Hurn I"*) ("The critical inquiry is whether Hurn had reached "normal retirement age", for if he had not, section 1053(a) would not protect him from the suspension of benefits he suffered"); *Hernandez v. Southern Nevada Culinary & Bartenders Pension Trust,* 662 F.2d 617, 620 (9th Cir.1981) ("ERISA gives an employee-participant no vested right to *receive* pension benefits until he reaches normal retirement age. . . . Congress never intended to impose upon a plan a requirement that any

---

**13.** Section 203(a)(3)(B), 29 U.S.C. § 1053(a)(3)(B) states in pertinent part:

A right to accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that the payment of benefits is suspended for such period as the employee is employed, subsequent to the commencement of payment of such benefits—

(ii) in the case of a multiemployer plan, in the same industry, in the same trade or craft, and the same geographic area covered by the plan, as when such benefits commenced.

The Secretary shall prescribe such regulations as may be necessary to carry out the purposes

of this subparagraph, including regulations with respect to the meaning of the term "employed".

**14.** Section 2530.203–3(b)(2) of 29 C.F.R. (1982) states in pertinent part:

If benefit payments have been suspended . . . payments shall resume no later than the first day of the third calendar month after the calendar month in which the employee ceases to be employed in section 203(a)(3)(B) service: *Provided,* That the employee has complied with any reasonable procedure adopted by the plan for notifying the plan that he has ceased such employment.

benefits be payable before age 65") (emphasis in original).

The case law thus makes clear that section 203(a) provides no protection against the suspension of benefits of plan participants, such as Chambless, who have not yet reached normal retirement age.[15] The DOL regulations support this position in stating that "[a] plan may provide for the suspension of pension benefits which commence *prior to the attainment of normal retirement age* ...." 29 C.F.R. § 2530.203–3(a) (1982) (emphasis added). Therefore, as long as the plan begins paying him benefits upon his attainment of normal retirement age, Chambless has no claim under section 203(a) or the DOL regulations.[16]

### C

### *Amendments 46 and 47 and Their Alleged Arbitrary, Capricious, and Discriminatory*

*Nature*—Chambless next maintains that Amendments 46 and 47 must fall under another section of ERISA, the section setting forth the fiduciary duties of plan trustees. 29 U.S.C. § 1101 *et seq.* He argues that the amendments are arbitrary and capricious, discriminatory, and in bad faith and that the trustees violated their fiduciary responsibilities in enacting such regulations.[17]

Chambless contends that the two amendments establish an invidious discrimination by suspending the benefits of retiree-participants who return to work on non-MM & P vessels for far longer than those of participants who return to work on MM & P boats.[18] Complaint ¶ 28(d). According to Chambless, in passing the amendments, the plan's trustees violated their fiduciary duties because the amendments, he argues,

15. This holding with regard to section 203(a) is consistent with a letter that the defendants have submitted concerning Patrick L. Sullivan, a plan participant who challenged the plan's suspension of his early retirement benefits because he evidently had taken prohibited employment. Exh. 17 to Maher Aff. In the Sullivan letter, the DOL stated that the suspension of his early retirement benefits was not improper under section 203(a) because Sullivan had not yet reached normal retirement age. Urging the court to show "great deference to the interpretation given the statute by the officers or agency charged with its administration," *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), defendants argue that since the DOL upheld Amendments 46 and 47, so should the court uphold them—against not just plaintiff's challenge under section 203(a), but also against his challenge that they are arbitrary and capricious.

There is one flaw to this argument, however. In assessing the validity of Amendments 46 and 47 under section 203(a), the court has, of course, shown "great deference" to the finding of the DOL in the Sullivan letter. The problem with defendants' argument, however, is that the Sullivan letter failed to consider two of the key issues in this lawsuit—the discriminatory nature of Amendments 46 and 47 and the likely reduction from $920 to $470 in Chambless' retirement benefits. In other words, the Sullivan letter was limited to one question—whether section 203(a) prohibits the suspension of early retirement benefits. It did not consider whether other aspects of Amendments 46 and 47 were arbitrary, capricious or discriminatory and therefore violated fiduciary duties.

16. Just as section 203(a) does not bar the plan from suspending Chambless' benefits before he reaches normal retirement age, nor would it bar the plan from refusing to pay his wife survivor benefits should Chambless die before reaching age 65.

17. If it is arbitrary, capricious and improperly discriminatory to suspend until age 65 the benefits of a retired participant who returns to work on a non-MM & P vessel, but suspend only for the duration of re-employment the benefits of a participant who returns to work on an MM & P vessel, then it would be arbitrary, capricious and improperly discriminatory to deny survivor benefits to the spouse of a participant who returns to work on a non-MM & P boat and dies before age 65, while allowing survivor benefits for the spouse of a participant who returns to work on an MM & P vessel and dies before age 65.

18. Chambless makes an additional, although vague argument that the trustees acted in a discriminatory matter. He maintains that the trustees have not suspended the pension benefits of "favored" employees who have gone to work on non-MM & P vessels and that therefore they acted in an arbitrary, capricious and discriminatory manner toward him when they suspended his pension for taking non-MM & P work. In making such an argument, Chambless has furnished the court with "conclusory allegations" only and not with any "concrete particulars." *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). For this reason, summary judgment is granted the defendants on this issue.

were not enacted "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), but instead primarily to help the MM & P and shipping companies that have contracts with the MM & P in their struggle against rival companies and unions. Chambless argues that the main purpose of the amendments was to deter MM & P members from working on vessels that had contracts with MEBA, that is, as yet another weapon in the MM & P's war against its rival union. Complaint ¶¶ 15, 28; Chambless Aff. ¶¶ 18–20.

To bolster his allegation that the amendments were passed for discriminatory reasons and not in the interest of the plan's participants, plaintiff has submitted an affidavit quoting the deposition of Charles Hemming, a former MM & P vice president, who stated that "the thrust [for Amendments 46 and 47] was from the union side" and that the idea of the amendments was to make it difficult for new shipping companies to find workers. Opsahl Aff. ¶ 12. He said that the plan trustees knew that "these new companies . . . would have a need for skilled licensed deck officers," and that "the only source . . . available would be members of the MM & P." *Id.* Hemming stated:

> The hoped effects of this amendment would be to deny the experienced personnel to operate these newer ships that were coming off because so much of an efficient ship operation depends upon the master's judgment, and he can make or break a company.
>
> . . . .
>
> Q. So the purpose in effect was to keep these experienced masters away from the companies that most needed them; is that correct?
>
> A. That was my understanding of it, yes.

A notice that was published numerous times in the union's official newspaper unwittingly adds some weight to Chambless' argument that the amendments had a discriminatory aim. That notice, including its telling title, reads in relevant part:

> STAY ON COURSE . . .
> Sailing Non-MM & P Contract Ships Jeopardizes Pension & Benefits
>
> Should you be offered an opportunity to accept employment aboard a non-MM & P contracted vessel, be sure you realize what you are doing, insofar as your Health & Benefit and Pension benefits are concerned.
>
> . . . .
>
> You accrue pension credits as a result of sailing aboard MM & P contracted vessels participating in the Pension Plan. Do not jeopardize your ultimate *pension* benefits by accepting employment aboard non-MM & P contracted vessels.

Exh. 7 to Maher Aff. (emphasis in original).

Defendants of course differ with Chambless about the reasons behind the disputed amendments. MM & P President Lowen asserts that they were passed "to preserve and enhance the corpus of the MM & P Pension Plan," to "[s]trengthen the base of the MM & P Pension Plan." Lowen Aff. ¶ 7, *quoting* Lowen Dep. at 127–30. He said the amendments would protect the corpus of the fund by "keeping available to our companies the people who are sailing under them. . . . If you're sailing under the MM & P Pension Plan, and contributions are being made on your behalf, you're preserving the trust." *Id.*

While Lowen asserts that Amendments 46 and 47 were needed to ensure that there were enough workers for the vessels of contributing employers in the event of a labor shortage, *id.*, Chambless retorts that this is mere pretext because in his view there has long been a surplus of qualified workers—evidenced by the competition between the experienced seamen and the "new young blood"—to fill the spots of contributing employers. Chambless Aff. ¶ 33. Chambless argues that because this is so, the trustees could have adopted the amendments only to prevent competing employers from obtaining the qualified employees they need.

Section 404 of ERISA, 29 U.S.C. § 1104, sets forth the fiduciary duties of a plan trustee:

(a)(1) . . . a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries* and—

(A) *for the exclusive purpose of:*

(i) *providing benefits to participants* and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . . .

(D) *in accordance with the documents and instruments governing the plan* insofar as such documents and instruments are consistent with the provisions of this subchapter.

(emphasis added).

■ Several courts have held that pension fiduciaries may breach their duties not only by violating these specific provisions, but also by acting "arbitrarily and capriciously." In *Riley v. MEBA Pension Trust,* 570 F.2d 406, 413 (2d Cir.1977) ("*Riley I*"), a seminal ERISA case, Judge Friendly wrote:

It has been suggested that after January 1, 1975 [the date ERISA's fiduciary provisions took effect], new federal standards of fairness must apply with respect to charges of breach of fiduciary duty not explicitly covered by Part 4 of ERISA . . . . We have no difficulty with th[is] argument, . . . but *we know of no federal standard that would here be applicable other than the arbitrary or capricious one already discussed, see Morgan [v. Laborers Pension Trust Fund],* 433 F.Supp. [518], 524 [ (N.D.Cal.1977) ]; *cf. Rehmar v. Smith,* 555 F.2d 1362, 1371 (9 Cir.1976) (emphasis added).

In the latter case cited by Judge Friendly, the Ninth Circuit wrote that decisions of pension trustees "may be reversed only where they are arbitrary, capricious or made in bad faith, not supported by substantial evidence, or erroneous on a question of law." *Rehmar v. Smith, supra,* 555 F.2d at 1362. This language is almost identical to that which the Second Circuit used in a pre-ERISA case assessing whether pension trustees had violated their fiduciary duties under section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5).[19] *See Beam v. MM & P,* 511 F.2d 975, 980 (2d Cir.1975).[20] Thus the court concludes that the "arbitrary and capricious" standard is the proper level of review to apply here.[21]

---

**19.** Section 302(c)(5), 29 U.S.C. § 186(c)(5), states that it is unlawful for any labor organization or any agent of any labor organization to demand or accept money from an employer, except as compensation, provided that this prohibition shall not be applicable

with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents. . . .

The provision then sets forth a host of requirements for such trust funds.

**20.** In *Beam,* Judge Moore stated that the standard was "whether the Trustees' decision was arbitrary or capricious, the product of bad faith, and whether or not such decision was based on substantial evidence." 511 F.2d at 980.

**21.** Defendants argue that the court should not apply the "arbitrary and capricious" standard. They maintain instead that the court should not upset any of the plan's eligibility requirements unless the defects of the plan violate the stan-

dard set forth in *UMW Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). In that case, which was brought under the LMRA rather than ERISA, the Supreme Court held that where pension eligibility provisions are the product of collective bargaining, rather than the work of trustees who are given plenary power to determine eligibility requirements, the plan's collectively bargained provisions and the trustees' implementation of those provisions "are entitled to the same respect as any other provision in a collective bargaining agreement," *id.* at 575, 102 S.Ct. at 1234, that is to say, they are immune from attack "[a]s long as such conditions do not violate federal law or policy." *Id.*

Amendments 46 and 47 were adopted in August, 1976. In April, 1977, Chambless submitted his pension application, which was rejected and from which this lawsuit springs. Ultimately, Amendments 46 and 47 "were incorporated in and became a part of the 1978 Collective Bargaining Agreement." Plan's

Chambless' argument that Amendments 46 and 47 violate ERISA's fiduciary duties on the ground that they were not adopted "solely in the interest of the [plan's] participants and beneficiaries," 29 U.S.C. § 1104(a)(1), draws support from *Winpisinger v. Aurora Corp.*, 456 F.Supp. 559, 566 (N.D. Ohio 1978). That case explores ERISA's fiduciary obligations in great depth and states that "the lead line of section 1104(a)(1) imposes a separate and overall requirement upon the trustees to discharge all of their duties 'solely in the interest of

the participants and beneficiaries'—Congress thereby added a responsibility over and above the prohibition against self-dealing."

In addition, Chambless argues that the amendments also violate 29 U.S.C. § 1104(a)(1)(D) by failing to be "in accordance with the documents and instruments governing the plan." The "Powers and Duties" section of the Agreement and Declaration Trust establishing the plan states that the trustees "shall discharge their

Memorandum in Support of Motion for Summary Judgment at 16. Section XXIX, Subpart B of the 1978 Agreement states, in pertinent part:

There shall continue in effect (a) the benefits and eligibility rules of the MM & P Pension Plan in effect under the Agreement as of June 15, 1978.

*See id.*

Even though Amendments 46 and 47 were ultimately incorporated in the collective bargaining agreement, there are several reasons why the "absent conflict with federal law or policy" standard of review that was articulated in *Robinson* is not applicable here.

First and foremost, the incidents relevant to this case occurred before the effective date of the 1978 collective bargaining agreement, which incorporated by reference Amendments 46 and 47.

Second, the amendments were effectively adopted by the trustees pursuant to the full authority granted them in the Agreement and Declaration of Trust, rather than by the union and employers through collective bargaining. In *Robinson,* the Supreme Court, distinguishing pension provisions adopted through give-and-take collective bargaining from those adopted by trustees who are given broad discretion to establish eligibility rules, stated, with apparent approval:

The Court of Appeals has held ... "that [where] the Trustees have 'full authority .... with respect to questions of eligibility' ... the court's role is limited to ascertaining whether the Trustees' broad discretion has been abused by the adoption of arbitrary or capricious standards."

455 U.S. at 573, 102 S.Ct. at 1233, *quoting Pete v. UMW Welfare & Retirement Fund of 1950,* 517 F.2d 1275, 1283 (D.C.Cir.1975) (*en banc*). This would argue in favor of applying an "arbitrary and capricious" standard of review in the case *sub judice.*

Third, in *Robinson,* the Supreme Court noted that the district court had found that the disputed provisions were "the subject of explicit, informed and intense bargaining." 455 U.S. at 569, 102 S.Ct. at 1231. Here, the defendants

have made no such showing. Indeed, it appears as if that part of the 1978 contract which incorporated Amendments 46 and 47 was merely *pro forma.* However, because the disputed amendments were not included in the collective bargaining agreements until after the acts relevant to this lawsuit occurred, we need not reach the question whether this type of *pro forma* incorporation of the provisions into a collective bargaining agreement—far different from "explicit, informed and intense bargaining"—would warrant the same deferential standard of review that the Court established in *Robinson.* We doubt, however, that Amendments 46 and 47 would be entitled to such deference because of their *pro forma,* matter-of-fact incorporation in the collective bargaining agreement.

This view is supported by *Hurn v. Retirement Fund Trust,* 703 F.2d 386 (9th Cir.1983), in which the defendants asserted that the challenged provisions were the product of collective bargaining and that the deferential *Robinson* standard should apply. Rejecting this argument, the Ninth Circuit stated that the disputed provisions were not the " 'subject of explicit, informed and intense bargaining.' " *Id.* at 389, *quoting Robinson.* The court added, in language that is applicable in this case:

"Nothing in the record suggests that the [challenged rule] was established in collective bargaining. The trustees enjoyed the initiative on changes in the Fund. The formulation and pre-drafting debate over all rules ... was their responsibility. Rules did have to be ratified by union and employer representatives before they could be adopted by the trustees. Independent approval by representatives of each side, however, is not the equivalent of collective bargaining. *Robinson,* therefore, is inapplicable." *Id.*

Lastly, even if the *Robinson* standard were applicable here, the amendments would still not be immune to attack, for they appear to conflict with federal laws and policies, for example, the policy barring labor organizations from restraining or coercing employees in exercising their rights under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157.

duties *solely in the interest* of those entitled to benefits hereunder." Article V, Section (1)(b) of Agreement and Declaration of Trust, Exh. 1 to Maher Aff. (emphasis added). *Cf. Winpisinger v. Aurora Corp., supra,* 456 F.Supp. at 567. Chambless makes a similar claim in his fifth cause of action, which alleges that "Defendants have breached the contractual rights to pension benefits as provided under the plaintiff's contract of employment in violation of 29 U.S.C. § 185." Complaint ¶ 42. In this cause of action, Chambless is evidently referring to the plan's Agreement and Declaration of Trust and the "solely in the interest" language quoted above.[22]

■ The court of course recognizes that "[a]ctuarial considerations and the long-term health of the plan are valid concerns of the trustees[,]" *Kozlesky v. Board of Trustees for Amalgamated Department Store Retirement Income Plan,* 546 F.Supp. 466, 468 (E.D.Mich.1982), and that these considerations may have been a factor in the passage of Amendments 46 and 47. Nevertheless, plaintiff has carried his burden of showing that there is a dispute over the material issue of whether Amendments 46 and 47 were adopted to maintain the fund's financial integrity or for other, less laudable motives that might be inconsistent with the trustees' fiduciary obligations. Chambless has also offered "concrete particulars," *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978), such as the Hemming deposition, to establish that there are additional disputes over whether the trustees, in adopting the amendments, acted "solely in the interest of the participants and beneficiaries," acted arbitrarily and capriciously, or acted with improper discriminatory or bad faith motives.[23]

22. In his complaint, Chambless also alleges that Amendments 46 and 47 and the suspension and reduction of his benefits are "void and ultra vires" because they are "inconsistent with . . . the plaintiff's contract of employment, and the Trustees lacked authority to derogate from those benefits." Complaint ¶ 30. This claim is almost identical to both his claim of a breach of fiduciary duty under 29 U.S.C. § 1104(a)(1)(D) and his fifth cause of action. Thus, there is no need to address Chambless' ultra vires claim separately.

23. Chambless makes a related argument that Amendments 46 and 47, along with other aspects of the plan, violate § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), on the ground that they contain "structural deficiencies." In blunderbuss fashion, Chambless contends that the plan regulations are not sufficiently detailed, that there is too much intermingling between the union and the plan, that Amendments 46 and 47 are arbitrary and capricious, and that all these things constitute structural deficiencies that the court should correct.

Many courts have held that they have jurisdiction to examine whether certain trust funds set up under the LMRA have structural deficiencies. *See, e.g., Burroughs v. Board of Trustees of Pension Trust Fund for Operating Engineers,* 542 F.2d 1128, 1131 (9th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Johnson v. Botica,* 537 F.2d 930, 934 (7th Cir.1976). One court has written that "[a] 'structural' defect is present when 'pension trustees, acting under the authority of the trust fund "arbitrarily and capriciously" den[y] pensions to employees.'" *Elser v. IAM National*

Pension Fund, 684 F.2d 648, 652 (9th Cir.1982), quoting Ponce v. Construction Laborers Pension Trust, 628 F.2d 537, 541 (9th Cir.1980). The Second Circuit, however, "has not displayed enthusiasm for the notion that § 302(c)(5) gave the federal courts a roving jurisdiction over . . . the structure of pension plans." Riley I, supra, 570 F.2d at 412; see also Lugo v. Employees Retirement Fund, supra, 529 F.2d at 254–55. In Riley I, Judge Friendly went on to say:

It is not obvious from either the language of § 302(c) or from the legislative history why a plan is not "for the sole and exclusive benefit of the employees of such employer" simply because the agreed division of pension benefits strikes a court as unfair .... In any event, now that we have ERISA with its extensive provisions for fiduciary responsibility, Part 4, §§ 401–414, 29 U.S.C. §§ 1101–1114, and the direction implicit in § 514(a), 29 U.S.C. § 1144(a), superseding state laws, for the federal courts to develop a federal common law with respect to plans covered by ERISA, there can be little justification for relying on § 302(c)(5) to accomplish the same goals.

570 F.2d at 412–13. On a similar note, Chief Judge Feinberg wrote in Lugo, referring to ERISA:

The careful attention paid by Congress in that recently enacted statute to the problem of effective dates and coverage makes us hesitate to conclude that the courts have long been authorized via the fifth exception to a criminal statute, [i.e. § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5),] to create obligations similar to those of ERISA.

Thus, summary judgment is denied on these issues.

### D

■ *Selection of 65 as Normal Retirement Age*—Chambless next argues that the plan's establishing 65 as the normal retirement age is a "sham." Complaint ¶ 28(a). He asserts that 65 is not the normal retirement age because more than 90 percent of the participants retire before age 65. Noonan Aff. ¶ 16; Noonan Reply Aff. ¶ 6. Chambless asserts that the selection of 65 was arbitrary and capricious and that retirement has "normally been based upon years of service rather than the attainment of any chronological age." Noonan Aff. ¶ 16. Although Chambless is less than clear in his argument here, he seems to be saying that the plan adopted 65 as its normal retirement age so as somehow to deter licensed deck officers from working for competing companies and unions and to make it easier for the plan to penalize participants who take jobs on non-MM & P vessels. Chambless Aff. ¶ 28.

The plan maintains that its adoption of age 65 as the normal retirement age was in good faith and was done pursuant to the recommendation of its actuarial consultant.[24] Exh. 15 to Maher Aff. at 16. As further evidence that selecting 65 as the normal retirement age was not a "sham," the plan notes that in 1980 the average age at which plan participants retired was 62.7. Maher Reply Aff. ¶ 3. Defendants maintain that the mere two-year difference between 62.7 and 65 negates any inference that the new normal retirement age was adopted to penalize "bad boys" who accept employment on competing vessels.

The relevant language of ERISA defines "normal retirement age as the earlier of—

(A) the time a plan participant attains normal retirement age under the plan, or

(B) the later of—

---

529 F.2d at 255 (footnote omitted). In light of the Second Circuit's unenthusiastic attitude toward using § 302(c)(5) as a basis for patrolling pension plans and inasmuch as "[t]he actions of trustees are subject to the same standard of review under ERISA's fiduciary provisions as under the LMRA[,]" *Elser v. IAM National Pension Fund, supra,* 684 F.2d at 654; *Rosen v. Hotel & Restaurant Employees,* 637 F.2d 592, 596 n. 5 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *accord Gordon v. ILWU–PMA Benefit Funds,* 616 F.2d 433, 438 (9th Cir.1980); *Riley I, supra,* 570 F.2d at 413, there is no reason here for the court to examine the plan regulations under § 302(e), 29 U.S.C. § 186(e). To paraphrase the court in *Morgan v. Laborers Pension Trust Fund,* 433 F.Supp. 518, 524 (N.D. Cal.1977): "The applicability of the fiduciary requirements of [the LMRA] is of questionable importance since defendants concede that the court has jurisdiction over this case under [ERISA]. It appears that the same 'arbitrary and capricious' standard of review governs judicial supervision of trustees, regardless of the origin of their fiduciary duties."

Because it would be redundant to assess the validity of the plan regulations under § 302, after evaluating them under ERISA, the court declines Chambless' unnecessary invitation for it to rework under the LMRA the "arbitrary and capricious" analysis it has already done under ERISA.

**24.** In the section of its report and recommendations regarding normal retirement age, the actuarial consultant, the Martin E. Segal Company, wrote:

It is important to have a clear statement in the Plan defining the normal retirement age. This will then be the age at which deferred vested benefits become payable. Also, the law seems to require a plan to grant a fully vested benefit to an employee who retires after he reaches the normal retirement date regardless of his benefit credits. Thus, your present eligibility test of 15 years of benefit credits for a reduced Pension will have to be dropped for an employee who works to retirement age. It may not even be permitted to reduce the 15 years to 10. We therefore suggest that you take advantage of a provision of the law which permits you to define normal retirement age as "the later of age 65 or the age on the tenth anniversary of the employee's participation in the plan." Even with such a definition, it will be possible for an employee to become a participant at, say, age 58 and because his employment is not steady, reach age 68 with less than 10 and perhaps only 5 years of service. The benefit will be small but at least the Fund will not find itself paying benefits based on a year or two, and in extreme cases, only a few months of service.

Exh. 15 to Maher Aff. at 16.

(i) the time a plan participant attains age 65, or

(ii) the 10th anniversary of the time a plan participant commenced participation in the plan.

29 U.S.C. § 1002(24).

In mounting his attack against age 65 as the normal retirement age, Chambless relies on statutory language, legislative history or precedent than on a dictionary definition of "normal" ("conforming to a usual or typical pattern," *American Heritage Dictionary* (1976)). While we are reluctant to parse through the many dictionary definitions of "normal," there is no need to turn to the dictionary here because the statutory language is clear.

The leading case on the question of normal retirement age, one rather similar to the instant case, holds that ERISA presents no bar—except in the case of arbitrary and capricious or bad faith actions—to the decision of a pension plan to raise its normal retirement age to 65. In *Janowski v. International Brotherhood of Teamsters, supra,* plaintiffs contended that their pension plan's decision to change the normal retirement age from 57 to 65 improperly deprived them of the right to receive their vested benefits at age 57. Rejecting their arguments, the Seventh Circuit held that 26 U.S.C. § 411(a)(8), which is the analog in the Internal Revenue Code of 29 U.S.C. § 1002(24) and contains the identical definition of normal retirement age, "authorized any normal retirement age subject to the limitations of 65 years or 10 years of service." 673 F.2d at 937. The *Janowski* court found that the trustees, acting as fiduciaries when they raised the normal retirement age, did not act improperly in "balanc[ing] desired benefits against economic realities." *Id.* In other words, the court held that increasing the normal retirement age was acceptable when its bona fide purpose was to preserve the corpus of the pension fund.

The Seventh Circuit rejected the plaintiffs' argument that ERISA "mandate[d]

that the normal retirement age remain the same in the [post-ERISA] Plan as it was in the [pre-ERISA] Plan." *Id.* at 936. The court concluded that "the trustees certainly could have established a normal retirement age of less than 65; the statutory language, however, in no way requires them to do so." *Id.* at 937. In explaining its decision, the court added:

the required amendments were costly and Congress wisely committed [to the plan trustees] the task of balancing eligibility standards and benefit levels against the ability of the plans to pay. We agree that 65 was permissibly chosen as the normal retirement age.

*Id.* The Supreme Court specifically denied certiorari on this issue. —— U.S. ——, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

From the affidavit of Maher, the plan administrator, and from the report and recommendations submitted by the Martin E. Segal Company, an actuarial consultant to the plan, Exh. 15 to Maher Aff., it appears that the plan adopted age 65 as its normal retirement age to "promot[e] the financial integrity" of the plan. *Janowski, supra,* 673 F.2d at 937. Plaintiff has offered only "conclusory allegations," *SEC v. Research Automation Corp., supra,* 585 F.2d at 33, that the trustees' selection of 65 was a sham, was not in good faith, or was taken for reasons other than to maintain the financial integrity of the plan. Chambless has failed to present any evidence shedding light on how the amendment raising the normal retirement age, inasmuch as it was passed a year before Amendments 46 and 47, was enacted with the intention of operating in conjunction with those two amendments to punish participants who went to work on non-MM & P boats. "Concrete particulars" and not "conclusory allegations" are needed to oppose a motion for summary judgment. *Id.* at 33.

Chambless' challenge to the plan's adoption of 65 as the normal retirement age must be rejected, and summary judgment is granted the defendants on this issue.[25]

---

**25.** The two cases that plaintiff belatedly cites

regarding the definition of normal retirement

### E

*Reduction of Chambless' Anticipated Benefits*—Chambless asserts that as a result of his work on a non-MM & P vessel, his pension benefits will be reduced from an estimated $920 a month to an estimated $470 a month and that the plan regulations therefore illegally cause his benefits to be forfeited. Again, Chambless has failed to specify exactly which provision of ERISA this reduction violates, but he is apparently arguing that this alleged forfeiture violates § 203(a) of ERISA, 29 U.S.C. § 1053(a). In addition, Chambless charges that in allowing his expected benefits to be reduced in such a manner, the plan trustees have violated their fiduciary duties.

On May 21, 1976, Jack Murray, a pension plan supervisor, sent Chambless a letter stating that he had accumulated thirty-one and one-quarter years of pension credits and that this "will entitle you to a monthly benefit of approximately $920.00." Exh. A

to Complaint. On June 30, 1977, Murray again wrote Chambless, informing him that "on a flat rate basis you are entitled to $570.00 per month," [26] and that "your percentage benefit ... will be in the area of $900.00 to $920.00." Exh. B to Complaint.

After Chambless' application for early retirement benefits was rejected and after plaintiff took work on a non-MM & P vessel, Maher, in a letter dated January 28, 1980, notified Chambless' lawyer:

> At the present time, based on employment through 1977, Capt. Chambless has 32¼ years of pension credit. Under the Rules in effect at the time he applied for a pension, the maximum credit a Member could receive was 30 years of pension credit, which would provide a monthly benefit of $470.00, or 60% of his "pay," whichever is higher.
>
> Assuming he does not accrue additional pension credit under the M.M. & P. Pen-

---

age are enlightening, but distinguishable. In *Johnson v. Franco,* No. 79–2262, slip op. (E.D.La. Dec. 21, 1981), the plan regulations incorporated the statutory definition of normal retirement age. Johnson had worked from 1946 to 1969 as a member of the National Maritime Union and under the plan regulations qualified for a "service pension." There was no set minimum age requirement under the plan for receiving a service pension, and service pensions apparently provided for full pension benefits. The court concluded that because he had qualified for what was a full pension under the plan, Johnson had reached normal retirement age, and as a result the plan could not suspend payment of his benefits when he went back to work in a different trade. *Cf. Hurn I, supra; Riley, supra.*

First, unlike in *Johnson,* in the instant case, the plan's regulations have a definition of normal retirement age that is neither open-ended nor ambiguous. Second, here, unlike in *Johnson,* the plan clearly distinguishes between early retirement benefits and normal retirement benefits. Third, in *Johnson,* there was no challenge that the plan's normal retirement age was a sham; the case focused instead on interpreting the plan's ambiguous definition of normal retirement age.

The issue in the second case that Chambless cites, *Nichols v. Board of Trustees of Asbestos Workers Local 24 Pension Plan,* No. 79–0263, slip op. (D.D.C. Feb. 23, 1979), was similar to that in *Johnson.* In *Nichols,* the plan regulations did not expressly define what the normal

retirement age was, but did state the requirements for obtaining a "Normal Pension:"

> An Employee shall be eligible to receive a Normal Pension if he retires after:
> a) he has been credited with twenty-five (25) years of credited service at any age, or
> b) he has attained the age of sixty-five (65) and has been credited with a minimum of five (5) years of credited service.

*Id.* at 1. The plaintiffs, who were under 65 and were credited with 25 years of service, brought suit after the plan suspended payment of their benefits for allegedly working in the same trade, industry and area. Having no clear-cut definition of normal retirement age to rely on, the court found that the plan participants who brought suit must have reached normal retirement age because they had qualified for "normal pensions." The court wrote:

> [V]iewing the Plan as a whole, in conjunction with the purposes to be achieved by ERISA, it appears to the Court that defendants may not divest these plaintiffs of their vested pension rights by arguing that they have not reached their normal retirement age when their own plan considers them to be eligible for a normal pension.

*Id.* at 4.

Unlike in *Nichols,* in the case at bar, the plan explicitly defines normal retirement age. Moreover, unlike in *Nichols,* the MM & P plan has no full, fixed "normal pension;" instead one's pension apparently increases steadily as participants accumulate service credits.

**26.** *See* note 2, *supra.*

sion Plan, he will be entitled, commencing as of January 1, 1987 [the date on which he would start receiving benefits after he turns 65], to a monthly payment of $470.00.

We arrive at the $470.00 per month in the following manner. The Wage-Related Pension, as you know, is calculated by using "pay" in the ten years preceding the effective date of the Member's pension. This would mean the ten years ending December 31, 1986, or 1977 through 1986. On the assumption described above, i.e., that Capt. Chambless does not engage in further covered [, i.e., MM & P,] employment through the date of January 1, 1987, there would be no "pay" in the measuring ten-year period. The "flat" $470.00 monthly amount would thus be higher than the Wage-Related calculation and consequently such $470.00 per month would be the pension benefit payable.

Exh. C to Complaint.

Chambless contends that this anticipated decrease in benefits is an illegal forfeiture. He notes that before working on a non-MM & P vessel, he was entitled to a $920-a-month early retirement benefit from age 55, but that after taking such work, he will likely be entitled to only $470 a month from age 65. Chambless' actuarial expert found that this has resulted in a decline of more than $125,000 in the actuarial value of his pension account. Garfield Aff. ¶ 9.

Although it is unclear which specific plan regulations Chambless is attacking here, it appears that his target is that section of the regulations which sets forth the rule on which Maher relied in his letter quoted above. Under Article II–A, Section 3 of the plan regulations, a participant with thirty years of credit is to receive monthly pension benefits of "$470 or 60% of pay, whichever is higher." In Article II–A, Section 3(ii), the plan regulations go on to define "pay" as the "average base monthly wages of the employee during the period of any 5 consecutive years within the last 10 years immediately preceding the effective

date of the pension, which will produce the highest average for the Employee."

■ Chambless has failed to make any showing that he had a vested right in a $920-a-month pension, and for that reason, the court, with the record before it, does not find that the anticipated reduction in benefits contravenes the nonforfeitability provisions of § 203(a) of ERISA, 29 U.S.C. § 1053(a). Nor has Chambless made any showing that the prospective $470-a-month pension falls below a statutory minimum set by ERISA. Chambless has made more of a showing, however, that Article II–A, Section 3 of the plan regulations, in conjunction with other plan provisions, has an arbitrary, capricious and invidiously discriminatory effect upon him and thus violates the trustees' fiduciary duties.

At first glance, Article II–A, Section 3 appears neutral and nondiscriminatory; however, this case raises some serious questions about its potential to be used in a discriminatory manner. As discussed above, Chambless has made some showing that certain provisions of the plan may improperly discriminate against participants who work on non-MM & P boats and may not be in the sole interest of plan participants, *supra* at 22–29, and this has caused the court to question why Article II–A, Section 3 uses as its base years—and the exact language is important—"the last 10 years immediately preceding the effective date of the pension," rather than a more logical and more pro-participant base such as "the last ten years in covered employment."

Article II–A, Section 3 is apparently fair to participants who apply for benefits right after retiring and intend to spend the rest of their lives in retirement. The provision also seems fair to participants who retire from covered employment, apply for a pension, and take work in a different industry inasmuch as these individuals can still receive a pension and still have their ten most recent—and likely most highly paid—years of covered employment counted. The only participants whom this provision would injure are those who retire from MM & P

work and then take work on a non-MM & P vessel because then, pursuant to this provision in conjunction with Amendments 46 and 47, they cannot receive benefits until they turn 65 and will not have these years in noncovered employment counted as base earning years. Instead, these years count as zero. This likely means that instead of having their benefits based on the more generous percentage basis, they will be based on the lower flat basis.[27]

Thus it is patent that Article II–A, Section 3, in conjunction with Amendments 46 and 47, not only will deter participants from taking non-MM & P employment, but also will likely punish them by reducing their benefits if they work on non-MM & P vessels. Notwithstanding Chambless' attacks on this provision, defendants have failed to come forward with any bona fide rationale for this provision, which has such great punitive potential.

This provision's ability to punish is even greater in light of the fact that under the pension regulations, a participant who works even one day on a non-MM & P vessel is not allowed to work again on an MM & P vessel unless and until he receives "express" permission from the plan. Article II–A, Section 16 of the plan regulations. Thus, if Chambless wanted to return to MM & P employment to accumulate some new base years from which his pension would be calculated, it appears that he might not

even be given permission to return to MM & P employment, pursuant to Article II–A, Section 16 of the regulations, because he apparently is a disfavored employee. What is more, if what Chambless alleges is true— that the union intentionally assigned him to inferior junior positions, refused to pursue his seniority claims, and in effect forced him to take a less humiliating job on a non-MM & P vessel—then the punitive, discriminatory potential of Article II–A, Section 3 becomes all the more glaring.[28]

■ In light of the defendants' failure to offer a good faith explanation for this challenged provision and viewing the record in the light most favorable to the party opposing the motion for summary judgment, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), the court finds that there is a dispute over the material issue of whether the regulations that cause Chambless' prospective pension payments to be reduced by almost 50 percent are arbitrary and capricious and improperly and purposely punitive and discriminatory.[29] Accordingly, summary judgment is denied, and this disputed issue will have to await resolution at trial.

F

*Estoppel and Representations of a Union Agent*—Chambless next maintains that because of alleged representations that a union hiring hall representative made to him,

---

**27.** Drastically reducing a participant's anticipated normal retirement benefits because he left retirement to work on a non-MM & P vessel as his last job before retiring appears analogous to denying a coal miner his pension benefits altogether because his last job, even for one day, before retiring was with a company that did not contribute to his pension plan. The District of Columbia Circuit disapproved of this rule in *Roark v. Boyle,* 439 F.2d 497 (D.C.Cir. 1970), and in *Roark v. Lewis,* 401 F.2d 425 (D.C.Cir.1968).

**28.** A rule such as this which causes a reduction in benefits to a participant who arguably was forced against his will to take non-MM & P work is analogous to the rule struck down in *Lee v. Nesbitt,* 453 F.2d 1309 (9th Cir.1971). In that case, the court found that the National Maritime Union Pension Trust acted arbitrarily and capriciously in denying benefits to a partic-

ipant who had his 15 years of pension credits erased because he had undergone an involuntary break in service. He had wanted to work on an NMU vessel, but there was no work available. The court wrote that "the rule, to the extent that it prohibits benefits to an employee solely because of an involuntary interruption in employment after the completion of his minimum employment requirement and before reaching retirement age, is unreasonable on its face." *Id.* at 1312.

**29.** If the court finds that it is arbitrary and capricious for the plan to reduce Chambless' normal retirement benefits by almost half because he went to work on a non-MM & P boat, then similarly it would be arbitrary and capricious for the plan to reduce his wife's survivor benefits just because he went to work on a non-MM & P boat.

the pension plan should be estopped—notwithstanding his employment on non-MM & P vessels—from suspending his early retirement benefits.

According to Chambless, about the time that the union was assigning him inferior positions on MM & P vessels, he asked George Clark, a union representative who served as dispatcher at the hiring hall in Mobile, Alabama, about the idea of his taking employment on a non-MM & P vessel. Chambless alleges that "Clark encouraged me to accept such employment. He advised me that there would be no objection from the MM & P, and that many MM & P members, while drawing pension benefits, were so employed." Chambless Aff. ¶ 12; see also Complaint ¶ 21. Chambless maintains that he acted in reliance upon Clark's advice and took a job upon a non-MM & P oil rig, the Mission Viking, not knowing that this action would put him in bad standing with the union and, together with his taking non-MM & P employment on the Mount Explorer, result in his not being allowed to collect pension benefits until he turns 65 and in the plan's cutting his prospective pension benefits by almost 50 percent. Complaint ¶¶ 21, 23.

Chambless argues that the union and the pension plan are so "commingled" that it was reasonable for him to rely on the purported green light that Clark gave him. As an example of such commingling, Chambless notes that union officials and union hiring halls carry out investigations, at the plan's bidding, into whether certain participants are engaged in prohibited employment that would cause the suspension of their benefits. Opsahl Aff. ¶¶ 6–8; Exh. C & D to Opsahl Aff. In addition, Chambless points out, the union screens some applicants regarding their pension eligibility, and union counsel serves as co-counsel for the pension plan. Opsahl Aff. ¶ 11.

The plan denies improper commingling and replies that Chambless "only claims to have inquired about the Union rules, not the Pension Plan's rules." Plan's Memorandum in Support of Motion for Summary Judgment at 33. In its memorandum of law, the plan excerpts some telling portions of Chambless' deposition:

> So I told him, I says, *"How does the union look on that?"*
>
> "Oh, Arthur," he [George Clark] says, "lots of our members does that." ...
> "Don't worry about it." ... "You go right ahead if you want to go out there and work ...."
>
> He says, "We have no objections whatsoever."

*Id., quoting* Chambless Dep. at 821 (emphasis added by plan). The plan points out, however, that Chambless never sought advice from anyone in the union or at the plan regarding his subsequent employment on other non-MM & P vessels, including the Mount Explorer. *Id.* at 34, *quoting* Chambless Dep. at 415–16.

The plan's memorandum cites another illuminating segment of plaintiff's deposition:

> Q. When you spoke to Mr. Clark before you went on the Mission Viking, did you say anything to Mr. Clark about your plans for retiring?
>
> A. No. *I didn't discuss anything with Mr. Clark in my plans to retire ....*
>
> Q. So you didn't ask him whether sailing on the Mission Viking would violate any rules of the pension plan; is that right?
>
> A. I think I told you that Mr. Clark assured me that it was all right for me to go out and go to work on the Mission Viking ... *and I didn't go into any discussion.*

*Id.* at 34–35, *quoting* Chambless Dep. at 842 (emphasis added).

■ The principle of estoppel is that the "representation of fact made to a party who relies thereon with the right to so rely may not be denied by the party making the representation if such denial would result in injury or damage to the relying party." 1 S. Williston, *Williston on Contracts* § 139, at 601–02 (3d ed. 1957). *See also Rosen v. Hotel & Restaurant Employees Union,* 637 F.2d 592, 597 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981).

The reliance of a party like Chambless seeking to invoke the estoppel doctrine must be reasonable, however. *Knoll v. Phoenix Steel Corp.*, 465 F.2d 1128, 1132 (3d Cir. 1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257 (1973).

In this context, the Second Circuit has written, "[c]ourts have been reluctant to apply the estoppel doctrine to require the payment of pension funds." *Haeberle v. Board of Trustees of Buffalo Carpenters Health-Care Funds*, 624 F.2d 1132, 1139 (2d Cir.1980). The principal reason for such reticence is that "[t]he actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan." *Phillips v. Kennedy*, 542 F.2d 52, 55 n. 8 (8th Cir.1976), *quoted in Haeberle, supra,* 624 F.2d at 1139. *Cf. Rosen, supra,* 637 F.2d at 598. If such funds are too vital to allow plan trustees to obligate the fund through their representations, *a fortiori* union officials—who are not as clearly identified with pension funds as are trustees—should not be permitted to commit the funds to persons not entitled to them. *Chamberlin v. Bakery & Confectionary Union Pension Fund,* 99 LRRM 3176, 3179–80 (N.D.Cal. 1977).

The main issue here is whether Chambless' reliance on Clark's representations was reasonable.

The case law is instructive. In an analogous case involving a plaintiff's relying on a union business agent's representation that he was eligible for a pension, the court wrote that "it would plainly be unreasonable to rely on a promise made by a person having no authority to commit the Fund." *Chamberlin, supra,* 99 LRRM at 3178. The court added: "The principle of removal of administration from union control is . . . fundamental to the" pension plan. *Id.* at 3179. In another case where a participant relied on a union official's representation that he qualified for a pension, *Yglesias v. United Paperworkers Pension Fund,* 2 Emp. Ben.Cases 1851, 1852 (E.D.N.Y.1981), Judge

Nickerson wrote: "It is too plain to require discussion that Yglesias may not base a claim on the statements of the Brotherhood's president." It would seem that if this is true for "the statements of the Brotherhood's president," it is all the more true for those of a mere hiring hall dispatcher like George Clark.

■ Article IV, Section 1 of the Agreement and Declaration of Trust of the MM & P pension plan, like Section 302(c)(5)(B) of the LMRA, 29 U.S.C. § 186(c)(5)(B), makes crystal clear that only the trustees—and not the union—are authorized to obligate the plan. Although there is, as one would expect, a close relationship between the union and the plan in the instant case, the court concludes that it was simply unreasonable for someone with more than 32 years of experience to rely with regard to the future of his pension benefits on a vague, informal snippet of conversation with a mere hiring hall dispatcher, when that conversation did not even discuss the effect of Chambless' taking non-MM & P employment on his pension and when that dispatcher had no authority to bind the plan.

What the *Chamberlin* court wrote is on point here:

> To permit . . . a single oral statement by a union business agent to obligate the trust to provide benefits to persons not otherwise entitled to them would seriously erode the requirement that the fund be administered by representatives of both the employer and the employees solely for the benefit of the employees of the contributing employer. 29 U.S.C. § 186(c)(5). Any such erosion can create a loophole that would enable the unscrupulous to divert funds away from the proper parties . . . .

99 LRRM at 3180. *See also Knoll v. Phoenix Steel Corp., supra,* 465 F.2d at 1132 ("The district court felt that even if such a statement had been made, it would have been unreasonable for the employees to have relied upon it, since the authority to determine the use of the Pension Fund rest-

ed solely with the Retirement Board.... Again, we agree").[30]

While it is recognized that such rules may have a harsh effect on some unsophisticated, unsuspecting pension plan participants, it is clearly wise policy to reject invocations of the estoppel doctrine, except in extraordinary circumstances. *See Haeberle, supra,* 624 F.2d at 1139. Such an approach will help preserve the corpus of the pension fund from improper obligations made by loose-lipped plan administrators, company officials, and union agents and will encourage plan participants to direct their pension questions to the responsible parties. *See Thurber v. Western Conference of Teamsters Pension Plan,* 542 F.2d 1106, 1109 (9th Cir.1976) ("The fact that Thurber relied on representations of an employee of the firm retained to administer the trust fund would not estop the Pension Fund and its trustees from denying Thurber's eligibility for the pension. The rights of other pensioners must be considered and the trust fund may not be deflated because of the misrepresentation or misconduct of the Administrator of the fund").[31] Summary judgment is granted on this issue.

**30.** In his complaint, Chambless makes another estoppel claim. He alleges that "[b]y reason of ... the malice and hostility toward the plaintiff, tantamount to the malicious discharge of plaintiff by the defendants, defendants have waived any objection to plaintiff's action in obtaining other employment, and are estopped from denying plaintiff [his] full [pension] benefits." Complaint ¶ 38. This is also a species of estoppel claim, but it too must fail, for, as explained above, it would be improper to sap the corpus of the fund whenever there is a misdeed by a union official. Chambless' malicious discharge/estoppel claim is more properly seen as a duty of fair representation claim. *See discussion infra* at 60–61.

**31.** To buttress his estoppel argument, Chambless relies almost exclusively on *Carlsen v. MM & P Pension Plan Trust,* 80 N.J. 334, 403 A.2d 880 (1979). Finding that the union and pension plan were so commingled that certain union actions could estop the plan from refusing to pay the plaintiff retirement benefits, the New Jersey Supreme Court stated:

> The pension system was created by the union, union representatives serve as trustees of the pension fund, pension privileges are a union benefit, the union certifies eligibility for membership in the pension plan and both entities are benefited by the circumstance that the pension plan is funded entirely by employer contributions.

*Id.,* 403 A.2d at 883. The Carlsen court found that the plan was estopped from denying a pension to the plaintiff after the union had told him that if he paid several thousand dollars in missed dues to reinstate himself in the union—he missed making such payments for several years when he was engaged in non-MM & P work—he would receive his pension. Carlsen paid the money, but was still denied a pension. Chambless' reliance on *Carlsen* is misplaced for several reasons. First, *Carlsen* is a state law case, and pension plans are now an area controlled by federal substantive law, *Riley I, supra,* 570 F.2d at 412, *citing* 29 U.S.C. § 1144(a), and where "a federal statute determines rights and liabilities the federal common law ... is controlling with respect to whether the defense of estoppel is available." *Thurber, supra,* 542 F.2d at 1109, *citing Sola Electric Co. v. Jefferson Co.,* 317 U.S. 173, 196, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942); *see also Chamberlin, supra,* 99 LRRM at 3178. *Carlsen* used local rules of estoppel, and "federal courts have been consistent in holding that local rules of estoppel will not be permitted to thwart the purposes of statutes of the United States." *Sola Electric Co. v. Jefferson Co., supra,* 317 U.S. at 176, 63 S.Ct. at 174.

Second, in *Carlsen* both the union *and* pension plan had acted in such a way as to estop the plan from refusing to pay Carlsen his pension. The court wrote that "defendant union and pension trust handled matters in a way which would lead plaintiff to believe that by paying a reinstatement fee and subsequent dues he would protect his pension rights." 403 A.2d at 883. Thus, because Carlsen's estoppel holding is based on actions by both union and pension trust, its finding that the fund was estopped because of actions by the union is arguably an alternative holding or dictum. In the instant case, Chambless does not accuse the pension plan of having taken any actions that warrant the invocation of estoppel.

Third, while in *Carlsen,* the union actions out of which Carlsen's estoppel claim grew were official union policies implemented by the leadership of the union, in the case at bar there was no action by the MM & P as an institution, but instead merely a solitary statement by a subaltern in the union hierarchy.

Lastly, Chambless, citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), argues that *Carlsen* collaterally estops the plan from "disavow[ing] joint responsibility for plaintiff's predicament," 403 A.2d at 883, because of the close relationship between the plan and union. We decline Chambless' invitation to use offensive collateral estoppel here because *Carlsen* was decided under state, rather than federal law, because its analysis of

### G

*The Plan's Alleged Failure to Notify Chambless about Amendments 46 and 47 Before Plaintiff Accepted Non-MM & P Employment*—Chambless maintains that the plan failed to inform him of the far-reaching changes contained in Amendments 46 and 47 before he accepted work on a non-MM & P vessel. Complaint ¶ 29. He is arguing that the court should not allow the plan to enforce the punitive provisions of these amendments against him because he allegedly learned of them only after he took non-MM & P work.

Amendments 46 and 47 were adopted on August 26, 1976. Exh. 7 to Maher Aff.; Exh. E to Opsahl Aff. The amendments did not specify when they took effect, but it appears as if they became effective at passage. The October, 1976 edition of the *Master, Mate & Pilot,* the union newspaper, carried an article about the changes wrought by Amendments 46 and 47; it was written by plan administrator Maher and was headlined, "Retirement Defined: Important Changes." Exh. 7 to Maher Aff. The article, which ran on page 7, was accompanied by the text of the amendments. *Id.* Similarly, in its December, 1976 issue, the *Master, Mate & Pilot* ran a long article on page 13 in which Maher explained, *inter alia,* the import of the two new provisions. The article's headline was "Pensioners Are Still Prohibited From Working in Maritime Industry." *Id.*

Chambless acknowledges that he took steady employment on the Mount Explorer on April 4, 1977. Exh. 8 to Maher Aff; Chambless Aff. ¶ 15. Although the exact dates are not clear from the record, Chambless apparently worked a two-week stint on a non-MM & P oil rig shortly before he took work on the Mount Explorer. Chambless Aff. ¶ 14. Chambless said he learned of the import of Amendments 46 and 47 "only after having made my [pension] application"—he was probably talking about his April 2, 1977 application—Chambless Aff. ¶ 29. He also stated that he "did not become aware of . . . the effects of Amendments 42, 46 and 47 until receipt of a letter dated March 13, 1978, from the Administrator[.]" Plaintiffs' Statement Pursuant to Local Rule 3(g) at 10. Although the exact date on which Chambless finally learned about these amendments is unclear, whichever date it was apparently came after he started working on a non-MM & P vessel.

Certainly it would be an arbitrary and capricious action and a breach of fiduciary duty for fund trustees to penalize participants for taking actions contrary to newly adopted eligibility requirements without first providing them with adequate notice of the new provisions.[32] Fiduciaries of a fund cannot punish participants pursuant to a new rule unless they first take responsible steps to notify them of the new rule.

The plan asserts that the two newspaper articles provided Chambless with adequate notice of the amendments, but Chambless contends that he learned of the amendments only after he took actions that the amendments condemned. It is not clear to the court that Chambless would have ever seen the Maher articles if he were at sea when the October and December, 1976 editions of the MM & P newspaper were published. If he had seen the articles early enough, perhaps he would not have accepted non-MM & P work.

the alleged commingling between the plan and union seems inadequate, and because the specific actions in *Carlsen* which led to the invocation of the estoppel doctrine involved far more union-pension plan cooperation than did George Clark's alleged advice, which involved no pension plan participation whatsoever.

**32.** The Restatement of Trusts (Second) emphasizes the importance of a trustee's obligation to communicate material facts to beneficiaries. The Restatement stated that the trustee is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest.

Restatement (Second) of Trusts § 173, Comment B (1959); *see also Rosen v. Hotel & Restaurant Employees Union, supra,* 637 F.2d at 599–600.

The plan has failed to present any evidence regarding how widely circulated the newspaper is and how likely it was that Chambless would have seen it. Thus, viewing the record in the light most favorable to the party opposing the motion for summary judgment, *Adickes v. S.H. Kress & Co., supra,* 398 U.S. at 157, 90 S.Ct. at 1608, the court concludes that there is a dispute over the material issue of whether the union took reasonable steps to ensure that Chambless was notified about Amendments 46 and 47 before he took work punishable under those amendments. Accordingly, summary judgment is denied.

H

*The Plan's Refusal to Comply with Chambless' Request for Information*
—Chambless next maintains that defendant Maher is liable to him, pursuant to § 502(c) of ERISA, 29 U.S.C. § 1132(c), to the amount of $100 per day since April 26, 1978, for the plan's failure to supply Chambless with certain information that he requested. Complaint ¶¶ 23, 31.

In a lengthy correspondence with Maher, Chambless requested many documents, and the plan furnished him with much of what he sought. On March 6, 1978, Chambless' previous counsel, Edward Thompson, requested a copy of the plan's regulations, Exh. 18 to Maher Aff., and on March 19, 1978, the plan sent him the regulations. Exh. 19 to Maher Aff. On March 22, 1978, Chambless' attorney requested all plan records "which involve applications ... by other members whose circumstances are or were ... similar to the instant matter." Exh. 20 to Maher Aff. On April 26, 1978, counsel for the plan wrote Chambless' lawyer that the plan had only one other case in which a participant had his pension suspended until normal retirement age for taking work on a non-MM & P vessel. Exh. 21 to Maher Aff. Plan counsel advised Chambless' attorney that "such records are not made available to anyone other than the particular member himself or his duly authorized representative." *Id.* With regard to the request of Chambless' counsel

for the papers in any past or present litigation over similar questions, Exh. 20 to Maher Aff., lawyers for the plan responded that such a request is "beyond the scope of any documentation that the Plan is required to furnish and would be an undue burden upon the Plan." Exh. 21 to Maher Aff.

After an almost year-long gap in correspondence between Chambless' lawyers and the plan, Arthur Wisehart, Chambless' current counsel, wrote the plan on April 12, 1979, to notify it that he was handling plaintiff's appeal of the denial of his pension application. Exh. 22 to Maher Aff. On April 23, 1979, Chambless' counsel requested that he be allowed "to examine prior decisions of the Board of Trustees regarding claims under the pension plan." Exh. 23 to Maher Aff. Five days later, Maher wrote Chambless' attorney that "it would be premature ... to make Plan records available to you pertaining to prior decisions .... Your request involves reviewing 24 years of Pension Minutes." Exh. 24 to Maher Aff.

On June 1, 1979, Chambless' attorney requested copies of two collective bargaining agreements and the collective bargaining history of the changes in the pension plan regarding normal and early retirement age. Exh. 27 to Maher Aff. On June 22, 1979, Maher sent copies of the two collective bargaining agreements to Chambless' counsel and stated that he did not have the information requested on the collective bargaining history because the plan does not participate in such bargaining. Exh. 28 to Maher Aff.

Chambless' attorney wrote a letter on July 11, 1979, reiterating his desire to review all of the trustees' decisions and asking for a copy of the plan's Agreement and Declaration of Trust, a list of amendments to the plan, and a copy of a third collective bargaining agreement. Exh. 29 to Maher Aff. Twenty days later, Maher wrote that he would provide copies of the Declaration of Trust, the amendments to it, and the third collective bargaining agreement. Exh. 30 to Maher Aff. In addition, Maher wrote that plan counsel had advised him

that a participant's attorney is not entitled to access to any and all determinations by the plan trustees. *Id.*

On August 4, 1979, Chambless' lawyer wrote Maher to say that he had not received "the information needed to prepare adequately" his appeal to the trustees—he was evidently referring to the records of past cases—and that he reserved "all rights as to the request for other information, which was not supplied." Exh. M to Opsahl Aff. At Chambless' appeal before the plan trustees on December 5, 1979, his attorney renewed his demand to see information on past rulings in similar cases. Tr. of Appeal Hearing at 15–17, Exh. F to Complaint.

ERISA contains numerous provisions that specify what documents and information a plan must provide participants. The plan must furnish each participant with a summary plan description containing such information as the names and addresses of the administrator and trustees, the eligibility requirements, and the circumstances that may result in loss of benefits. 29 U.S.C. §§ 1021(a)(1), 1022(b); 29 C.F.R. § 2520.-104b–2 (1982); *see Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). The plan administrator must also furnish to each participant a copy of the plan's annual report, which is basically a report on the plan's financial status. 29 U.S.C. §§ 1023, 1024(b)(3); 29 C.F.R. § 2520.104b–10 (1982). ERISA also requires plan administrators to furnish information on total benefits accrued to all participants who request such information. 29 U.S.C. § 1025(a). The plan must also make available for inspection the latest annual report, collective bargaining agreement and trust agreement. 29 U.S.C. § 1024(b)(2). Finally, the Act provides for the assessment of a penalty, at the discretion of the court, against "[a]ny administrator who fails or refuses to comply with a request for any information which such administrator *is required* by this subchapter to furnish to a participant or a beneficiary . . . ." 29 U.S.C. § 1132(c) (emphasis added). *See Paris v. Profit Sharing Plan,* 637 F.2d 357, 362 (5th Cir.), *cert. de-*

*nied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Nugent v. Jesuit High School,* 625 F.2d 1285, 1285–86 (5th Cir.1980); *LeFebre v. Westinghouse Electric Corp.,* 549 F.Supp. 1021, 1028 (D.Md.1982).

The plan contends that it "fully complied with each request for documents made by Chambless or his counsel," Pension Plan Defendants' Statement Pursuant to Local Rule 3(g) ¶ 21, while Chambless maintains that the plan "did not fully comply with its duty to supply information." Plaintiffs' Statement Pursuant to Local Rule 3(g) at 10. Here, the plan is clearly mistaken in stating that it "fully complied" with Chambless' requests for documents; however, fortunately for the plan it has misstated the issue. The issue is not whether the plan furnished Chambless with all the information that he requested, but instead whether it provided him with all the documents that ERISA requires it to furnish.

■ The flood of correspondence between Chambless and the plan indicates that the plan turned over everything or gave Chambless access to everything that it was required to under ERISA. The Act states:

> The administrator shall make copies of the plan description and the latest annual report and the bargaining agreement, trust agreement, contract, or other instruments under which the plan was established or is operated available for examination by any plan participant or beneficiary in the principal office of the administrator . . . .

29 U.S.C. § 1024(b)(2). The plan furnished Chambless with the Declaration of Trust, three collective bargaining agreements, the amendments to the plan, the plan's rules and regulations, and information about Chambless' prospective benefits.

Neither ERISA nor the federal regulations issued thereunder make any mention of any requirement that plan participants be allowed to see the minutes of trustees' meetings or prior decisions by the trustees. Nor has Chambless furnished the court with even one case supporting his position here.

The language of ERISA makes clear that Congress was concerned that requests for pension plan information not be too taxing on plan officials and not be too costly to the plan itself. *See, e.g.,* 29 U.S.C. § 1024(b)(4). In addition, Maher's concern that Chambless' request for complete access to information about all past denials might invade the privacy of some participants is a legitimate concern. Exh. 21 to Maher Aff. What is more, the fact that the court gave Chambless access to some of these materials during the discovery phase of this lawsuit certainly does not mean that the trustees were required to turn over that information in the first instance. The "relevance" standard of Rule 401, F.R.Evid., is far more generous to the participant seeking information than are the specific standards that Congress set forth in ERISA.

Because Congress, in spelling out in exacting detail what information plans must make available to participants, did not require plans to provide the information that the plan refused to furnish to Chambless, the plan defendants' motion for summary judgment is granted with respect to Chambless' demand for a $100-a-day penalty for their refusal to comply with all of his information requests.[33]

I

*Adequacy of the Plan's Review of Chambless' Application*—Chambless charges that the plan failed to provide him with a "full and fair review" of his application in violation of § 503 of ERISA, 29 U.S.C. § 1133. Complaint ¶ 31. He asserts that the review was unfair on three grounds: that he was denied access to certain information that he wanted to use to prepare his appeal, Tr. of Appeal Hearing at 15–16, Exh. F to Complaint, that he was not allowed to ask certain questions at his March 5, 1980 appeal hearing before the trustees, *id.* at 8–10, 18, and that the trustees were biased against him. Complaint ¶ 31.

Section 503 of ERISA, 29 U.S.C. § 1133 states:

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant [of any denial], and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary on the decision denying the claim.

The regulations that the Secretary issued pursuant to this section reiterate the need for adequate notice, 29 C.F.R. § 2560.503–1(e) (1982), a "reasonable opportunity to appeal a denied claim," 29 C.F.R. § 2560.-503–1(g)(1), and a "full and fair review of the claim and its denial." *Id.* The regulations add that

[e]very such procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may:

(i) Request a review upon written application to the plan;

(ii) Review pertinent documents; and

(iii) Submit issues and documents in writing.

*Id.*

As discussed *supra,* the plan did not refuse to furnish Chambless' counsel with any material that ERISA requires be made available. Because Chambless' attorney was allowed to "[r]eview [those] pertinent documents," *id.,* that he requested and that the plan was required by law to turn over, the court cannot conclude that Chambless was denied a full and fair hearing on the

---

**33.** As part of his grabbag approach to litigation, plaintiff's lawyer has raised several other ERISA issues that are totally irrelevant to this lawsuit. One issue raised is that the trustees have violated their fiduciary duties by authorizing the union and its hiring halls to investigate whether plan participants are engaged in prohibited employment. Another issue raised, although it clearly does not apply to Chambless, is that the plan regulations require participants to belong to the union in order to apply for a pension. It goes without saying that under section 203(a), 29 U.S.C. § 1053(a), such a restriction would be illegal if it prevented someone from receiving normal retirement benefits. In any case, neither of these two issues need be addressed by the court because neither is relevant to the case at bar.

ground that he did not receive all the information that he had sought.

During the trustees' meeting, Chambless' lawyer sought to interrogate two trustees, but the chairman of the meeting would not let him question the trustees at that time. The meeting chairman stated that the purpose of the hearing was for Chambless' counsel to "present the facts" and for the trustees to ask questions, if they had any. Tr. of Appeal Hearing at 6, 11, Exh. F to Complaint. In addition, in refusing to allow Chambless' attorney to interrogate trustees at the hearing, the chairman stated, "we will give you the opportunity to submit questions in writing . . . and we will give you the opportunity to present a further appeal at a future Trustees' meeting." *Id.* at 10. Later, he reiterated that "you can pose any questions that you like, and . . . they will be answered in writing." *Id.* at 17. From the January 28, 1980 letter of Maher to Chambless' counsel, it is clear that the plan did respond in writing to several of the questions that plaintiff's lawyer had asked at the hearing. Exh. C to Complaint. That the chairman of the hearing stated that the trustees would respond to the questions of Chambless' lawyer in writing rather than orally at the meeting is certainly not reason to find that the hearing was unfair.

Lastly, Chambless stated that he "was told on December 4, 1979, the evening before the hearing, that the Trustees had already made up their minds." Complaint ¶ 31. Chambless, however, has offered only "conclusory allegations," rather than "concrete particulars," about the trustees' alleged bias. At no time during the hearing did any trustee exhibit any of the specific bias that Chambless alleges. Indeed, considering the frequent testiness and contentiousness of Chambless' counsel, the trustees seemed downright patient during the 90-minute hearing. They heard Chambless' lawyer make a full presentation on a range of issues—alleged breaches of the union's duty of fair representation, Tr. of Appeal Hearing at 20–24, Exh. F to Complaint, estoppel, *id.* at 29, the discrimination and intimidation that Chambless allegedly faced, *id.* at 22–24, and the argument that the plan's normal retirement age was a "sham", *id.* at 32.

For all these reasons, Chambless' arguments that the hearing was neither full, nor fair must be rejected, and the defendant's motion for summary judgment must be granted on this issue.

**J**

 *Antitrust Claims*—Chambless alleges that the MM & P and several shipping companies that have collective bargaining agreements with the MM & P have combined and conspired in restraint of trade by interfering with the ability of licensed deck officers to engage in their trade. Complaint ¶¶ 34–36. In short, Chambless asserts that Amendments 46 and 47, along with several accompanying regulations and actions, restrain the mobility of many MM & P members and thus violate sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.

Although Amendments 46 and 47 appear to have anticompetitive aims, Chambless has failed to make crystal clear exactly what the antitrust injury is that he is suffering. He seems to say that the injury is the alleged shrinkage of the actuarial value of his pension account. He apparently is not suffering from lost earnings because his salary now is evidently higher than before.

It is difficult to see how the injury that Chambless alleges "is *antitrust* injury, that is to say, injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). In his efforts to find a legal theory about which relief for his client's grievance could be granted, Chambless' counsel adopted the blunderbluss or fishing expedition approach—putting every colorable theory into his complaint. "[P]laintiff has attempted to assert an antitrust claim when [his] true grievance is grounded in" ERISA and duty of fair representation law. *Laurie Visual Etudes, Inc. v. Chesebrough-Pond's, Inc.,*

473 F.Supp. 951, 960 (S.D.N.Y.1979) (Weinfeld, J.). In another context, Judge Friendly has written: "Combining an assertion of general antitrust violation with a claim of injury from breach of contract or tort does not automatically make the latter a claim arising under the antitrust laws." *Salerno v. American League of Professional Baseball Clubs,* 429 F.2d 1003, 1004 (2d Cir.1970), *cert. denied,* 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). Similarly, trying to graft a purported antitrust injury onto a claim of injury from a violation of ERISA "does not automatically make the latter a claim arising under the antitrust laws." *Id.* Because the injury that Chambless alleges is not the species of injury that the antitrust laws aim to protect, defendants' motion for summary judgment is granted as to Chambless' antitrust cause of action.[34]

### K

■ *Duty of Fair Representation*—In his fourth cause of action, Chambless claims that the MM & P breached its duty of fair representation, but he does not specify exactly how the union violated that duty. Complaint ¶¶ 39–40.

A fair reading of Chambless' complaint leads to a conclusion that he is asserting a claim under both of the traditional types of fair representation claims. First, in charging that his union has systematically discriminated against older, more experienced employees in favor of new, young blood, *id.* ¶ 15, Chambless makes a claim somewhat analogous to the discrimination claim made in the landmark duty of fair representation case, *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). *See* Complaint ¶ 15; Chambless Aff. ¶¶ 6–7. Second, in asserting that he had incurred the hostility of certain union officials and that as a result they did not

pursue his seniority grievance, Complaint ¶¶ 14–15; Chambless Aff. ¶ 4, or his overtime grievance, Complaint ¶ 16; Chambless Aff. ¶ 10, Chambless articulates a duty of fair representation claim similar to the type considered in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In that case, the Court stated that "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *Id.* at 191, 87 S.Ct. at 917.

In its answer, the MM & P has disputed Chambless' duty of fair representation claim, Answer of MM & P ¶¶ 14–16, 39–40, and this dispute will have to be resolved at trial.

### L

■ *Plaintiffs' Cross-Motion to Strike Maher and Lowen Affidavits*—Chambless has moved pursuant to Rule 56(e), F.R. Civ.P., to strike the affidavits of plan administrator Maher and MM & P President Lowen in support of the defendants' motion for summary judgment. Chambless contends that the two affidavits contain assertions that are legal conclusions and about which the affiants had no personal knowledge. While Chambless is correct that both affidavits contain such statements, that is still not sufficient reason to strike them. Chambless can trust the court to ignore or refrain from using those parts of the two affidavits which are defective. At the same time, the court will use those parts of the affidavits where it is clear that the affiants have personal knowledge. Thus, Chambless' motion to strike the affidavits is denied.

### CONCLUSION

To recapitulate, summary judgment is granted defendants on Chambless' antitrust claim[35] and on his claims that the suspen-

---

**34.** Inasmuch as Chambless' second cause of action is dismissed because it fails to state an antitrust injury, the question whether the nonstatutory labor exemption would have applied here had true antitrust injury been alleged need not be reached.

**35.** With the dismissal of Chambless' antitrust claims, the two employer organizations and the six shipping companies are dismissed as defendants. Because they are not plan fiduciaries, Chambless' ERISA claims do not apply to them. Section 402(a) of ERISA, 29 U.S.C. § 1102(a); Article IX, Section 1 of Agreement

sion of his benefits violates section 203(a) of ERISA, that the age 65 normal retirement age is a "sham," that the plan is estopped from suspending Chambless' benefits, that his application failed to receive adequate review, and that the plan improperly withheld information from him.

The motion for summary judgment is denied, however, with respect to Chambless' claims that Amendments 46 and 47 and the anticipated reduction in his benefits are arbitrary, capricious, and discriminatory. Summary judgment is also denied on plaintiff's claim that the plan failed to notify him about the import of Amendments 46 and 47 before he took work on a non-MM & P vessel. The duty of fair representation claim also survives to be resolved at trial.

IT IS SO ORDERED.

and Declaration of Trust; Article I, Section 7 of Plan Regulations.